# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

HARRISON COUNTY, MISSISSIPPI,
MAGNOLIA REGIONAL HEALTH
CENTER, AND CULLMAN REGIONAL
MEDICAL CENTER, INC., ON BEHALF
OF THEMSELVES AND ALL OTHERS
SIMILARLY SITUATED,

     PLAINTIFFS,

          - against -

BANK OF AMERICA CORPORATION;
BANK OF AMERICA, N.A.; MERRILL
LYNCH, PIERCE, FENNER & SMITH
INCORPORATED; BARCLAYS PLC;
BARCLAYS BANK PLC; BARCLAYS
CAPITAL INC.; BNP PARIBAS, S.A.; BNP
PARIBAS SECURITIES CORP.;
CITIGROUP, INC.; CITIBANK, N.A.;
CITIGROUP GLOBAL MARKETS INC.;
CITIGROUP GLOBAL MARKETS
LIMITED; CREDIT SUISSE AG; CREDIT
SUISSE GROUP AG; CREDIT SUISSE
SECURITIES (USA) LLC; CREDIT
SUISSE INTERNATIONAL; DEUTSCHE
BANK AG; DEUTSCHE BANK
SECURITIES INC.; THE GOLDMAN
SACHS GROUP, INC.; GOLDMAN,
SACHS & CO.; GOLDMAN SACHS BANK
USA; GOLDMAN SACHS FINANCIAL
MARKETS, LP; GOLDMAN SACHS
INTERNATIONAL; ICAP CAPITAL
MARKETS LLC; J.P. MORGAN CHASE &
CO.; J.P. MORGAN CHASE BANK, N.A.;
J.P. MORGAN SECURITIES LLC; J.P.
MORGAN SECURITIES PLC; THE ROYAL
BANK OF SCOTLAND GROUP PLC; ROYAL
BANK OF SCOTLAND PLC; RBS SECURITIES
INC.; TRADEWEB MARKETS LLC; UBS
AG; AND UBS SECURITIES LLC,

     DEFENDANTS.

Civil Action No. 1:16-cv-02382

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs bring this action for treble damages and injunctive relief on behalf of a class of all persons and entities who entered into interest rate swaps transactions with Defendants in the United States during the period January 1, 2007, through the present.

## NATURE OF THE CASE

1.      This antitrust class action concerns Defendants' anticompetitive conduct in the market for interest rate swaps ("IRS").

2.      IRS are a type of financial derivative used to manage interest rate risk and/or speculate on the direction of rates.  In simple form, an IRS transaction provides that, for a fixed amount of principal (the "notional" amount) and a fixed period of time, one party will agree to pay a fixed rate of interest in exchange for which it receives a floating, market-based rate from the counterparty.

3.      Interest rate swaps are an important portfolio management device for a wide array of corporations, hospitals, counties, municipalities, pension funds, and other types of institutional investors, a group collectively known as the "buy-side" of the IRS market.  Buy-side customers use these instruments principally to exchange their floating rate obligations or risks for fixed market rates, or vice versa.

4.      The global market for IRS is massive, with hundreds of trillions of dollars of notional value outstanding and over $1 trillion traded on a daily basis.

5.      Defendants Bank of America, Barclays, BNPP, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, JP Morgan, RBS, and UBS (the "Bank Defendants") are the primary incumbent dealers of IRS in the United States and, collectively, dominate the market.  Known as the "sell side" of the industry, the Bank Defendants serve as the largest IRS market makers, *i.e.*, the primary dealers willing to enter either side of an IRS transaction with a customer.

6.      Historically, IRS transactions were executed on an over-the-counter ("OTC") basis, meaning in direct bilateral dealings between, for example, a Bank Defendant and a buy-side entity.  In an OTC transaction, the buyer must contact a Bank directly to obtain a quotation, which the buyer must then accept or reject on the spot.  This framework was highly favorable for the banks because OTC trading, by its nature, limits the buy-side's ability to comparison shop using real-time price information.  It also entrenches the Bank Defendants as necessary parties to the vast bulk of trades, such that the upshot of OTC-style trading is substantially higher profits for the sell-side.

7.      These dynamics are not controversial.  It is well-understood that OTC markets generally lack the price transparency and effective competition associated with, for example, electronic exchange-style trading platforms, in which a centralized exchange serves the market-making function of accepting bids and offers from anonymous market participants (including buy-side entities) to match willing buyers and sellers at a competitive real-time price.

8.      Over time, many financial products and derivatives have migrated from OTC to exchange-style execution, with substantial benefits for competition and consumers because of the extent to which exchange-style trading improves price discovery and liquidity while eliminating traditional market makers (*i.e.*, the Bank Defendants) as rent-seeking intermediaries.

9.      This case is about Defendants' efforts to forestall the development of exchange-style trading for IRS by using their market power, collectively, to exclude rivals and new entrants from the marketplace.  In particular, Defendants boycotted and collusively targeted a series of new electronic trading platforms that would have allowed direct and/or anonymous comparison-shopping and IRS execution for the buy-side.  That type of market evolution—essentially an exchange-like platform for executing standardized IRS transactions—would have

delivered significant efficiency benefits and better prices for buy-side customers (*i.e.*, the proposed class) while eroding a traditional profit center worth billions per year to Defendants.

10.     As described below, Defendants worked together systematically to stop that progress in its tracks.  Their unlawful conduct included, *inter alia*, (i) using group boycotts and anticompetitive agreements to prevent the development and rollout of exchange-like trading platforms open to the buy-side; (ii) using group boycotts and other anticompetitive agreements to prevent existing inter-dealer electronic trading platforms from making their systems available to buy-side users; and (iii) retaliating against end-user customers that attempted to circumvent the traditional OTC trading system.

11.     Because of this cartel, Defendants have maintained tight control of the IRS market and extracted billions of dollars of supracompetitive rates from the proposed class in the years since 2007.

## JURISDICTION AND VENUE

12.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries Plaintiffs and other Class Members have suffered from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a), as well as Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

14.     Venue is proper in the Northern District of Illinois pursuant to 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b), (c), and (d), because during the class period all Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion

of the affected interstate trade and commerce discussed herein was carried out in this District.

15.    All Defendants are subject to personal jurisdiction in the United States because the alleged conspiracy was directed at, carried out in substantial part in, and had the intended effect of, causing injury to Plaintiffs and Class Members residing in, located in, or doing business throughout the United States, including within the Northern District of Illinois.  In addition, many of the Defendants are incorporated in and/or have their principal place of business in, and/or did substantial volume of IRS business in, the United States and this District.  The Bank Defendants also are subject to personal jurisdiction because they transacted business throughout the United States, including in this District, that was directly related to the claims at issue in this action, including IRS sales and trading business conducted in Chicago, Illinois.

16.    The anticompetitive activities of Defendants were directed towards this District and had substantial effect in this District and on its residents.  Defendants regularly and intentionally conducted large portions of their business through lines of interstate commerce terminating in the city of Chicago, Illinois.  For instance, the CME Group's OTC IRS clearinghouse clears billions of dollars a day in OTC IRS transactions, connecting buy-side investors, such as Plaintiffs, to sell-side investors, including Defendants.[1]

**Plaintiffs**

17.    Plaintiff Harrison County, Mississippi ("Harrison County") is a political subdivision of the State of Mississippi.  During the class period, Harrison County entered into IRS transactions directly with one or more Dealer Defendants.  As a result, Harrison County was injured by Defendants' unlawful and anticompetitive conduct.

18.    Plaintiff Magnolia Regional Health Center ("MRHC") is a hospital organized

---

[1] http://www.cmegroup.com/trading/interest-rates/cleared-otc/#data.

under the laws of the State of Mississippi with its principal place of business in Corinth, Mississippi.  During the class period, MRHC entered into IRS transactions directly with a Dealer Defendant.  As a result, MRHC was injured by Defendants' unlawful and anticompetitive conduct.

19.     Plaintiff Cullman Regional Medical Center, Inc. ("CRMC") is a hospital organized under the laws of the State of Alabama with its principal place of business in Cullman, Alabama. During the class period, CRMC entered into IRS transactions directly with one or more Dealer Defendants.  As a result, CRMC was injured by Defendants' unlawful and anticompetitive conduct.

**Defendants**

20.     Defendant Bank of America Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Charlotte, North Carolina.  Defendant Bank of America, N.A., a wholly owned subsidiary of Bank of America Corporation, is a federally chartered national banking association with its principal place of business in Charlotte, North Carolina, and branch locations in Chicago, Illinois.  On January 1, 2009, Bank of America acquired Merrill Lynch & Co., Inc.  Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York and with branch locations in Chicago, Illinois.  MLPFS is a wholly owned subsidiary of Bank of America Corporation.  In addition, MLPFS is registered as a broker-dealer with the U.S. Securities and Exchange Commission ("SEC"), and as a Futures Commission Merchant with the Commodity Futures Trading Commission ("CFTC").

21.     The term "Bank of America" includes all Bank of America affiliates identified in the

preceding paragraph, as well as their subsidiaries and affiliates, including Merrill Lynch & Co. and

Merrill Lynch Bank USA, that entered into IRS contracts with the Class, including as a dealer.

During the class period, Bank of America directly sold IRS to and bought IRS from Class

Members.  Bank of America also was a shareholder of Tradeweb during the class period.  Bank

of America transacts business in Chicago, Illinois and maintains Chicago offices and branch

locations.  Bank of America's conduct in trading and executing Interest Rate Swaps has

connected it to Chicago, Illinois in a meaningful way.

22.     Defendant Barclays PLC is a corporation organized and existing under the laws of

England and Wales, with its principal place of business in London, England.  Defendant

Barclays Bank PLC is a corporation organized and existing under the laws of England and

Wales, with its principal place of business in London, England and branch locations in Chicago,

Illinois.  Defendant Barclays Capital Inc. is a corporation organized and existing under the laws

of the State of Connecticut, and is a wholly owned subsidiary of Barclays Group US Inc., which

in turn is a wholly owned subsidiary of Barclays Bank PLC.  Barclays Capital Inc. is registered as

a broker-dealer with the SEC, and as a Futures Commission Merchant with the CFTC.

23.     The term "Barclays" includes Defendants Barclays PLC, Barclays Bank PLC,

Barclays Capital Inc., and their subsidiaries and affiliates that entered into IRS contracts with the

Class, including as a dealer.  Barclays transacts business in Chicago, Illinois, and Barclays Bank

PLC operates a Chicago branch.  During the class period, Barclays directly sold IRS to and

bought IRS from Class Members.  Barclays also was a shareholder of Tradeweb during the class

period.  Barclays' conduct in trading and executing Interest Rate Swaps has connected it to

Chicago, Illinois in a meaningful way.

24.     Defendant BNP Paribas, S.A. ("BNPP SA") is a corporation organized and

existing under the laws of France, with its principal place of business in Paris, France and branch locations in the United States, including in Chicago, Illinois.  Defendant BNP Paribas Securities Corp. ("BNPP Securities") is a corporation organized and existing under the laws of the State of Delaware, and is a wholly owned subsidiary of BNP Paribas North America, Inc., the ultimate parent of which is BNPP SA.  BNPP Securities is registered as a broker-dealer with the SEC, and as a Futures Commission Merchant with the CFTC.

25.     The term "BNPP" includes Defendant BNPP SA, BNPP Securities, and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer. BNPP transacts business in Chicago, Illinois.  BNPP directly sold IRS to and bought IRS from Class Members during the class period.  BNPP's conduct in trading and executing Interest Rate Swaps has connected it to Chicago, Illinois in a meaningful way.

26.     Defendant Citigroup, Inc. ("Citigroup") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York and corporate offices in Chicago, Illinois.  Defendant Citibank N.A. ("Citibank") a wholly owned subsidiary of Citigroup, is a federally chartered national banking association with its principal place of business in New York, New York and branch locations in Chicago, Illinois.  Defendant Citigroup Global Markets Inc. is a corporation organized and existing under the laws of the State of New York, and is a wholly owned subsidiary of Citigroup Financial Products Inc., whose ultimate parent is Citigroup.  In addition, Citigroup Global Markets Inc. is registered as a broker-dealer with the SEC, and as a Futures Commission Merchant with the CFTC.  Defendant Citigroup Global Markets Limited is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England.

27.     The term "Citi" includes Defendants Citigroup, Citibank, Citigroup Global Markets Inc., Citigroup Global Markets Limited, Citigroup Global Markets Inc., as well as their subsidiaries and affiliates, including but not limited to Citigroup Energy Inc., that entered into IRS contracts with the Class, including as a dealer.  Citi transacts business in Chicago, Illinois and maintains Chicago offices and branch locations.  Citi directly sold IRS to and bought IRS from Class Members during the class period, and was a shareholder of Tradeweb. Citi's conduct in trading and executing Interest Rate Swaps has connected it to Chicago, Illinois in a meaningful way.

28.     Defendant Credit Suisse Group AG is a corporation organized and existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland. Defendant Credit Suisse AG is a bank organized and existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland, and it maintains a Chicago, Illinois branch. Defendant Credit Suisse International is a bank organized and existing under the laws of England and Wales, with its principal place of business in London, England.  Defendant Credit Suisse Securities (USA) LLC is a corporation organized and existing under the laws of the State of Delaware, and is a wholly owned subsidiary of Credit Suisse (USA), Inc., whose ultimate parent is Credit Suisse Group AG.  In addition, Credit Suisse Securities (USA) LLC is registered as a broker-dealer with the SEC, and as a Futures Commission Merchant with the CFTC.

29.     The term "Credit Suisse" includes Defendants Credit Suisse Group AG, Credit Suisse AG, Credit Suisse International, Credit Suisse Securities (USA) LLC, and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer. Credit Suisse transacts business in Chicago, Illinois and maintains a Chicago office.  Credit Suisse directly sold IRS to and bought IRS from Class Members during the class period, and

was a shareholder of Tradeweb.  Credit Suisse's conduct in trading and executing Interest Rate Swaps has connected it to Chicago, Illinois in a meaningful way.

30.     Defendant Deutsche Bank AG is a corporation organized and existing under the laws of Germany with its principal place of business in Frankfurt, Germany.  Defendant Deutsche Bank Securities Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York and a corporate campus located in Chicago, Illinois, and is a wholly owned subsidiary of DB U.S. Financial Markets Holding Corporation, whose ultimate parent is Deutsche Bank AG.  Deutsche Bank Securities Inc. is registered as a broker-dealer with the SEC, and as a Futures Commission Merchant with the CFTC.

31.     The term "Deutsche Bank" includes Defendant Deutsche Bank AG, Deutsche Bank Securities Inc., as well as their subsidiaries and affiliates, that entered into IRS contracts with the Class, including as a dealer.  Deutsche Bank transacts business in Chicago, Illinois, and maintains a Chicago branch.  Deutsche Bank directly sold IRS to and bought IRS from Class Members during the class period, and was a shareholder of Tradeweb.  Deutsche Bank's conduct in trading and executing Interest Rate Swaps has connected it to Chicago, Illinois in a meaningful way.

32.     Defendant The Goldman Sachs Group, Inc. ("Goldman Sachs Group") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York and offices located in Chicago, Illinois.  Defendant Goldman Sachs & Co. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  Goldman Sachs & Co. is registered as a broker-dealer with the SEC, and as a Futures Commission Merchant with the CFTC.  Defendant

Goldman Sachs Bank USA, a wholly owned subsidiary of Goldman Sachs Group, is a New York state-chartered bank and a member of the Federal Reserve system, with its principal place of business in New York, New York.  Defendant Goldman Sachs Financial Markets, L.P. a wholly owned subsidiary of Goldman Sachs Group, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  Defendant Goldman Sachs International, another wholly owned subsidiary of Goldman Sachs Group, is a bank organized and existing under the laws of England and Wales, with its principal place of business in London, England.

33.     The term "Goldman Sachs" includes Defendants Goldman Sachs Group, Goldman Sachs & Co., Goldman Sachs Bank USA, Goldman Sachs Financial Markets, L.P., Goldman Sachs International, as well as their subsidiaries and affiliates, that entered into IRS contracts with the Class, including as a dealer.  Goldman transacts business in Chicago, Illinois and maintains a Chicago office.  Goldman Sachs directly sold IRS to and bought IRS from Class Members during the class period, and was a shareholder of Tradeweb.  Goldman Sachs' conduct in trading and executing Interest Rate Swaps has connected it to Chicago, Illinois in a meaningful way.

34.     Defendant ICAP Capital Markets LLC is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Jersey City, New Jersey.  As used herein, the term "ICAP" includes Defendant ICAP Capital Markets LLC and its subsidiaries and affiliates that acted as brokers for a wide range of asset classes, including IRS, the foreign exchange market, commodities, credit default swaps ("CDS"), and various equities. In the IRS market, ICAP acts as an inter-dealer broker, brokering IRS trades between dealers.  As explained below, ICAP agreed with the Dealer Defendants that it would not allow its

platform to be accessed by the buy-side of the IRS market. ICAP maintains offices in Chicago, Illinois, among other places, and regularly conducts trading business in the District.

35.     Defendant J.P. Morgan Chase & Co. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York and an office location in Chicago, Illinois. Defendant J.P. Morgan Chase Bank, N.A. is a federally chartered national banking association with its principal place of business in New York, New York and branch locations in Chicago, Illinois. Defendant J.P. Morgan Securities LLC (also known as "J.P. Morgan Securities Inc.") is a corporation organized and existing under the laws of Delaware, with its principal place of business in New York, New York and offices in Chicago, Illinois, and is a wholly owned subsidiary of J.P. Morgan Securities Holdings LLC, which in turn is a subsidiary of J.P. Morgan Chase & Co. J.P. Morgan Securities LLC is registered as a broker-dealer with the SEC, and as a Futures Commission Merchant with the CFTC. Defendant J.P. Morgan Securities Plc, a wholly owned subsidiary of J.P. Morgan Chase & Co., is a corporation organized and existing under the laws of the United Kingdom, with its principal place of business in London, England.

36.     As used herein, the term "JP Morgan" includes Defendants J.P. Morgan Chase & Co.; J.P. Morgan Chase Bank, N.A.; J.P. Morgan Securities LLC; J.P. Morgan Securities Plc; and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer. JP Morgan transacts business in Chicago, Illinois and maintains Chicago offices and branch locations. JP Morgan directly sold IRS to and bought IRS from Class Members during the class period, and was a shareholder of Tradeweb. JP Morgan's conduct in trading and executing Interest Rate Swaps has connected it to Chicago, Illinois in a meaningful way.

37.     Defendant Royal Bank of Scotland PLC ("RBS PLC") is the primary operating bank of Defendant The Royal Bank of Scotland Group PLC ("RBS Group PLC"), a corporation organized and existing under the laws of England and Wales with its principal place of business in Edinburgh, Scotland and an office in Chicago, Illinois.  Defendant RBS Securities Inc. a wholly owned subsidiary of RBS PLC, is a corporation organized and existing under the laws of Delaware, with its principal place of business in Stamford, Connecticut and offices in Chicago, Illinois.  RBS Securities Inc. is registered as a broker-dealer with the SEC, and as a Futures Commission Merchant with the CFTC.

38.     The term "RBS" includes Defendants RBS PLC, RBS Group PLC, RBS Securities Inc., and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer.  RBS transacts business in Chicago, Illinois, and RBS PLC maintains a Chicago branch.  RBS directly sold IRS to and bought IRS from Class Members during the class period, and was a shareholder of Tradeweb.  RBS PLC's conduct in trading and executing Interest Rate Swaps has connected it to Chicago, Illinois in a meaningful way.

39.     Defendant Tradeweb Markets LLC ("Tradeweb Markets") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  As used herein, the term "Tradeweb" includes Tradeweb Markets and its subsidiaries and affiliates that acted as providers of trading services for IRS, CDS, and other asset classes.  Tradeweb is jointly owned by Thomson Reuters and a consortium of Wall Street Dealers (the Bank Defendants other than BNPP), with the Bank Defendants exercising control over Tradeweb.  As explained below, the Dealer Defendants took control of Tradeweb to prevent it from developing an electronic trading platform that would have opened the IRS marketplace to competition and lower prices for buy-side customers, and further used their joint control of

Tradeweb as a means to coordinate other aspects of the conspiracy. Tradeweb is and was an instrument of the conspiracy, and clears a major number of its IRS transactions through the Chicago Mercantile Exchange.

40.     Defendant UBS AG ("UBS AG") is a corporation organized and existing under the laws of Switzerland with its principal places of business in Basel and Zurich, Switzerland and regional offices in New York, New York and Stamford, Connecticut. Defendant UBS Securities LLC is a corporation organized and existing under the laws of Delaware, with offices in Chicago, Illinois, and is an indirect wholly owned subsidiary of UBS AG. UBS Securities LLC is registered as a broker-dealer with the SEC, and as a Futures Commission Merchant with the CFTC.

41.     The term "UBS" includes Defendant UBS AG, UBS Securities LLC, and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer. UBS maintains a Chicago branch and transacts business in Chicago, Illinois. UBS directly sold IRS to and bought IRS from Class Members during the class period, and was a shareholder of Tradeweb. UBS' conduct in trading and executing Interest Rate Swaps has connected it to Chicago, Illinois in a meaningful way.

42.     Collectively, Defendants took actions in furtherance of the conspiracy both directed at and within the District, and directed actions within the District in furtherance of the conspiracy.

## FACTUAL ALLEGATIONS

### BACKGROUND

43.     An IRS is a type of "derivative" financial instrument, meaning a contract linked to the future value of another asset or benchmark. For IRS, the relevant benchmark is interest rates.

44.     The simplest and most common type of IRS involves a contract under which, for a fixed amount of principal and a fixed period of time, one party agrees to pay a fixed rate of interest in exchange for which the counterparty pays a floating rate tied to a market benchmark such as LIBOR.  Depending on the future direction of rates, the IRS contract becomes more valuable to one side or the other.

45.     IRS instruments are used to manage or hedge interest rate exposure and/or to speculate on the future direction of rates.  Typical buy-side users of IRS include corporations, pension funds, insurance companies, hospitals, banks, counties and municipalities, and many other institutional investors.

46.     The market for IRS is large.  The notional value of outstanding IRS is estimated at more than $400 *trillion* globally, with more than $1 trillion transacted daily.  Most of these instruments consist of U.S. dollar or Euro-denominated swaps, which together comprise approximately two-thirds of the total market.

47.     Traditionally, as the IRS market developed in the 1980s and 90s, buy-side customers executed IRS transactions on an *ad hoc* OTC basis, meaning customers would contact a dealer such as a Bank Defendant to request a price quote (in technical terms, a "bid"/"ask" quote) for a particular swap.  By policy and custom, the Bank Defendants typically required the immediate acceptance or rejection of the quoted price terms, which, in light of rapid interest rate movements in the marketplace, made it difficult for customers to comparison shop effectively among dealers.

48.     Owing to these dynamics, OTC derivative sales and trading became a highly lucrative profit center for the Bank Defendants.  The opaque nature of the OTC market, and the practice of requiring immediate acceptance of quoted swap terms, allowed dealers to inflate IRS

prices (known technically as the "bid/ask spread" or "spread") without buy-side customers having an effective way to obtain competitive quotes on a real-time basis.

49.     The OTC framework also entrenched the Bank Defendants as the dominant sell-side dealers.  By the early 2000s, the Bank Defendants were leading "market makers" for IRS and served as a party to the overwhelming majority of IRS transactions executed in the United States.

50.     In time, however, the IRS market became increasingly ripe for a shift away from the traditional OTC model in favor of electronic, exchange-like execution and clearing—a system of trading that fosters real-time competition and significantly lower spreads.

51.     Economists, regulators, and market participants recognize that exchange-style systems deliver considerable efficiency benefits relative to OTC-style execution.  Many financial products have migrated from OTC to exchanges over the years—equity options and currency transactions being two examples—with corresponding (and often dramatic) compression of spreads.

52.     At least three features of the IRS market made it suitable for exchange-type execution in the years preceding 2007.

53.     First, the terms of most IRS transactions became highly standardized, largely because the International Swaps and Derivatives Association ("ISDA") created standard form agreements and swap terms that effectively commoditized the IRS industry.  Since at least the early 2000s, standardized terms and contracts have governed most IRS transactions.

54.     Second, the combination of increasing standardization and market demand led to exponential IRS volume growth over time, with the size of the market increasing more than fivefold (*i.e.*, by hundreds of trillions of dollars) between 2000-2008.

55.     Third, to accommodate this volume, technology and electronic trading platforms evolved to enable efficient, exchange-like execution of IRS business in the *inter-dealer* segment of the market, that is, in the Bank Defendants' IRS transactions with each other (as distinct from their "retail" business with buy-side customers).

56.     In particular, the Bank Defendants' considerable volume of inter-bank IRS business is executed routinely through platforms characterized by many of the pro-competitive features of an exchange, including (i) the ability to view simultaneous quotes from multiple dealers, (ii) automatic matching of bids and offers at the best available price, and (iii) immediate execution.  Such benefits are inaccessible, however, to buy-side customers.

57.     The inter-bank market is thus more efficient—with considerably tighter spreads—than the "retail" market in which buy-side firms are forced to transact.

58.     This artificial division allowed the Bank Defendants to enjoy the competitive benefits of liquid, exchange-like trading platforms in their inter-dealer transactions, while preserving the inefficiency, lack of competition, and bank profits associated with OTC execution in their business with the buy-side.

59.     As described in more detail below, this case is about Defendants' collusive efforts to prevent buy-side customers from executing IRS transactions through more efficient and competitive means.  Absent the alleged conspiracy, buy-side IRS business would have migrated to electronic exchanges or exchange-like platforms accessible to buy- and sell-side entities alike (a so-called "all-to-all" platform), improving the overall efficiency of the market while eroding Defendants' market power and profits.  There is no pro-competitive justification for Defendants' collective action to forestall this development of the marketplace.

*DEFENDANTS' MARKET POWER*

60.     The Bank Defendants are the largest dealers of IRS in the United States, with collective control of approximately 70% of the market for Interest Rate Swaps transacted within the United States.

61.     Throughout the class period, the Bank Defendants collectively possessed market power with respect to executing IRS transactions with buy-side firms.  Defendants JP Morgan, Goldman Sachs, Deutsche Bank, Citi, and Barclays are the dealers for approximately 65% of buy-side transactions in IRS, with other Bank Defendants handling much of the balance.

62.     The Bank Defendants also possessed market power with respect to other IRS market participants, including but not limited to firms involved in brokerage, execution, communication, clearing, and trade documentation services (including but not limited to inter-dealer brokers, buy-side sales and trading platforms, SEFs, clearinghouses, exchanges such as CME, and trade organizations such as ISDA).

63.     The buy-side of the market, in contrast, is unconcentrated, consisting of thousands of customers of varying size, type, and sophistication.

64.     Barriers to entry are high.  Beyond the capital, regulatory, intellectual property, and technology barriers associated with launching an electronic trading platform for IRS, Defendants themselves stand as significant (and often insurmountable) barriers to entry.  That is, because of the incumbent dealers' market power—including the ability to restrict access to the inter-dealer segment of the market and their collective leverage over every material aspect of IRS execution, clearing, and market infrastructure—no firm or electronic platform was able to enter the IRS market to compete effectively for buy-side business during the class period.

65.     The IRS products at issue are standardized, commodity-like products, in that the terms and conditions of one Bank Defendant's IRS can be substituted readily for the same IRS offered by another Defendant.  Moreover, most IRS transactions are governed by standard form ISDA contracts.  As a result, buy-side consumers typically make IRS purchasing decisions based principally on price and, accordingly, would benefit substantially from exchange-style electronic trading of IRS instruments.

### *ANTICOMPETITIVE CONDUCT*

66.     Defendants engaged in two broad categories of anticompetitive conduct aimed at blocking exchange-style execution for buy-side users of IRS.  First, they used group boycotts and other anticompetitive conduct to crush upstart IRS platforms that threatened to disrupt the status quo.  Second, they used group boycotts and other anticompetitive conduct to prevent existing inter-dealer trading platforms from allowing buy-side access.

### Collective Action to Block Upstart Exchange-Style Platforms

67.     In 2007, a trading platform known as Tradeweb (owned at the time by Thomson Reuters) had positioned itself as a potential exchange-style swaps platform that would be available to buy-side customers.  Recognizing the threat, the Bank Defendants used their collective market power to stop Tradeweb in its tracks by threatening Tradeweb with a boycott that ultimately resulted in the Bank Defendants taking control of Tradeweb governance (hence ending all possibility of a buy-side exchange) in return for keeping their sell-side business on the Tradeweb platform.

68.     An October 11, 2007, Reuters report made the basic point explicitly, explaining that "The deal . . . will allow the banks to exercise more control over trading rules" on Tradeweb going forward.  The Bank Defendants thus collectively (and successfully) threatened Tradeweb

with a fatal group boycott—*i.e.*, the threat of losing the Bank Defendants' business on which Tradeweb was reliant—to eliminate the threat of a buy-side exchange.

69.     By asserting their collective leverage in this fashion, the Bank Defendants also secured a majority of Tradeweb board seats while stacking Tradeweb's governance committees with hand-picked current and former employees, guaranteeing that Tradeweb posed no risk to their OTC business and profits in the future.  In addition, the Tradeweb takeover allowed the Bank Defendants to meet regularly (under the auspices of Tradeweb governance) to coordinate similar collective strategies aimed at preserving the bifurcated structure of the swaps market.

70.     Tradeweb was useful to the Bank Defendants in just this sense in 2009, when a major inter-dealer swaps broker (Defendant ICAP) was preparing to launch an exchange-like trading platform known as i-Swap.  As with Tradeweb, the Bank Defendants believed ICAP could enable buy-side participation and thus viewed i-Swap as a serious potential threat.

71.     The Bank Defendants' solution was to use Tradeweb as a bargaining chip with ICAP, resulting in an arrangement under which (i) ICAP agreed to refrain from launching an all-to-all swap trading platform while (ii) Tradeweb agreed to refrain from expanding into ICAP's traditional business in the inter-bank segment of the swaps market.  This naked market allocation scheme served the conspiracy's broader goal of eliminating the threat of all-to-all exchanges while maintaining the strict bifurcation of buy- and sell-side trading for IRS.

72.     Defendants engaged in similar conduct with respect to the Chicago Mercantile Exchange ("CME").  CME is the world's leading exchange-based marketplace for derivatives and, as such, was uniquely positioned to launch a viable all-to-all trading platform (and clearinghouse) for IRS.  Indeed, CME planned to do just that.

73. In 2006, CME acquired an electronic swaps trading platform known as Swapstream and announced plans to introduce dollar-denominated swaps as a Swapstream product. By July 2007, CME was prepared to offer centrally "cleared" IRS trading (via Swapstream) starting in early-2008 on a platform designed to provide "unparalleled direct, anonymous access to high-volume customer groups through Swapstream's platforms, with the regulatory protection and risk management previously only available with exchange-traded products."[2] CME, in other words, was launching exchange-style trading for IRS.

74. CME also took concrete steps to secure the participation of the buy-side, announcing in February 2008 that "33 buy-side participants have committed to an Early Adopter Program (EAP) for CME Swaps on Swapstream, the first centrally-cleared interest rate swaps available to all over-the-counter (OTC) market participants . . . . The firms, representing a wide spectrum of US, European and Middle Eastern financial institutions, will lead the effort to bring this new and innovative product to the $271 trillion interest rate swap (IRS) market. They will be the first financial institutions to benefit from the balance sheet and operational efficiencies through central counterparty clearing and straight through processing, offered by CME Swaps on Swapstream. The new participants include banks, mortgage banks, asset managers, hedge funds and proprietary trading firms[.]"[3]

---

[2] *CME Swaps on Swapstream to be the First Centrally Cleared Interest Rate Swaps Available to All OTC Market Participants*, CME Group (July 17, 2007), http://investor.cmegroup.com/investor-relations/releasedetail.cfm?ReleaseID=254515.

[3] *Swapstream Announces 33 Participants for CME Swaps on Swapstream, the First Centrally Cleared Interest Rate Swap*, PR Newswire (Feb. 4, 2008), http://www.prnewswire.com/news-releases/swapstream-announces-33-participants-for-cme-swaps-on-swapstream-the-first-centrally-cleared-interest-rate-swap-56784472.html.

75.     CME was thus on the brink of a Swapstream rollout that, for the first time, would have allowed the buy-side to bypass the Bank Defendants and execute IRS on an efficient and competitive exchange.

76.     The Bank Defendants boycotted Swapstream, however, using their collective market power to kill the plan.

77.     Another example concerns Defendants' efforts to eliminate the risk of all-to-all trading through an entity known as LCH.Clearnet.

78.     LCH.Clearnet is a clearinghouse—a market intermediary that guarantees a transaction or trade for each counterparty.  Clearinghouses improve market liquidity essentially by eliminating counterparty credit risk.

79.     Clearinghouses also (for similar reasons) can be used to facilitate anonymous exchange-style execution for financial products because, with counterparty risk eliminated, parties are secure in their ability to transact anonymously on electronic real-time markets, including through automatic matching of competitive bids and offers on an exchange.

80.     Defendants understood, however, that clearinghouse systems—including the SwapClear platform operated by LCH.Clearnet—could easily evolve into an all-to-all exchange for IRS.  SwapClear, for example, was an established clearinghouse used to process a significant volume of IRS transactions in the years leading up to 2008.  Accordingly, the Bank Defendants worked together to take and exercise control over LCH.Clearnet to prevent any expansion into all-to-all trading.

81.     In particular, when an independent entity known as the Depository Trust & Clearing Corporation ("DTCC") announced in October 2008 that it had signed a preliminary

merger agreement with LCH.Clearnet, the Bank Defendants worked together to block the deal to stop DTCC and Swapstream from developing an integrated all-to-all swaps platform.

82.   The Bank Defendants did so by orchestrating a group consortium bid to acquire LCH.Clearnet, which forced DTCC to withdraw its offer.  At that point, with DTCC out of the picture, the Bank Defendants and Defendant ICAP were able to take control of LCH.Clearnet through a share buyback plan that gave "large users" (*i.e.*, principally the Bank Defendants) a 63% ownership stake, thereby satisfying the Bank Defendants' desire for "control of LCH.Clearnet largely for its SwapClear interest rate swaps clearing business."[4]

83.   Defendants continued to exercise their control throughout the relevant period by installing employees on LCH.Clearnet's board and blocking the development of any trading and clearing platform that would have enabled all-to-all execution of IRS.

### Similar Conduct in CDS Market

84.   The conduct described above—a pattern of systematic group boycotts and other anticompetitive activity aimed at blocking electronic exchange-style trading platforms accessible to buy-side customers—is strikingly similar to the Bank Defendants' conduct in the market for another type of derivative known as credit default swaps ("CDS").

85.   As in the IRS market, the Bank Defendants traditionally served as the dominant dealers in over-the-counter sales and trading of CDS.

86.   As in this case, the Bank Defendants worked together systematically to block the development of exchange-style platforms for buy-side customers of CDS, which, in the case of CDS, led to antitrust investigations by the Department of Justice and the European Commission

---

[4] Jeremy Grant, *LCH.Clearnet Streamlines Ownership Structure*, Financial Times (Nov. 6, 2009), http://www.ft.com/intl/cms/s/0/9279e7fa-cac5-11de-97e0-00144feabdc0.html#axzz40ONwi7CL.

("EC").  As the EC has explained, "the banks acted collectively to shut out exchanges from the market because they feared that exchange trading would have reduced their revenues from acting as intermediaries in the OTC market."[5]

87.     As with IRS, the CDS case involved the incumbent dealer banks boycotting an upstart exchange being developed by the CME group (a project known as CMDX).  In particular, the CMDX platform was preparing to launch in 2008 and would have allowed CDS market participants to interact directly with each other and bypass the Bank Defendants through all-to-all trading.  But the Bank Defendants killed the plan.

88.     In CDS, the dealers allegedly conspired to prevent the CMDX platform from securing necessary licenses from two bank-controlled entities, namely, the ISDA trade organization and an entity known as Markit.  The scheme worked and CMDX never got off the ground, after which a series of antitrust class actions was filed against ISDA, Markit, and most of the Bank Defendants concerning their alleged exclusionary conduct.  Those cases recently settled for $1.86 billion and injunctive relief.

89.     The *modus operandi* is clear.  When the Bank Defendants' OTC profits were threatened by exchange-style platforms—whether for CDS or IRS—the banks used their market power to work together to systematically crush these more efficient rivals.

### Collective Action to Deny Buy-Side Access to Inter-Dealer SEFs

90.     In the wake of the economic meltdown triggered in no small part by financial industry misconduct in the OTC derivatives markets, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank").

---

[5] EC Press Release, *Antitrust: Commission Sends Statement of Objections to 13 Investment Banks, ISDA and Markit in Credit Default Swaps Investigation*" (July 1, 2013), http://europa.eu/rapid/press-release_IP-13-630_en.htm.

91.     Dodd-Frank imposed a long list of structural reforms, including statutory provisions aimed at shifting swaps and other derivatives business away from the OTC model in favor of exchange-style trading, clearing, and reporting.  As the CFTC has explained, the legislative history "reveals a Congressional expectation that, over time, exchange trading of swaps would reduce transaction costs, enhance market efficiency, and counter the ability of dealers to extract economic rents from higher bid/ask spreads at the expense of other market participants."  *See* 17 C.F.R. Part 37 (June 4, 2013).

92.     But that is not what happened, principally because Defendants blocked any meaningful change to the status quo in the market for IRS.

93.     For example, Dodd-Frank called for the migration of OTC swaps business to exchange-like platforms known as swap execution facilities ("SEFs").  The idea behind the SEFs was precisely as described above:  that exchange trading would improve efficiency and prices for swaps and other derivatives, especially for buy-side customers, while reducing the systemic risks associated with opaque OTC derivative markets.

94.     Rather than embracing this mandate, the Bank Defendants conspired to preserve the status quo by exercising control over buy-side access to SEFs and preventing other market developments that would have led to real-time exchange-type competition for buy-side business.

95.     Defendants also conspired to impose a series of anticompetitive rules for buy-side execution (described in more detail below) that rendered the SEFs functionally indistinguishable from the traditional OTC structure of the industry.

96.     Finally, Defendants used their market power to threaten and retaliate against buy-side entities that attempted to participate in the type of competitive, exchange-style swap execution contemplated by Dodd-Frank.

97.     The experience of three SEFs is illustrative.

98.     By 2013, after Dodd-Frank regulations were implemented, several SEFs were preparing to launch electronic platforms for buy- and sell-side execution and clearing of swaps. Three in particular—TeraExchange, trueEX, and Javelin—were focused on creating integrated exchange-style execution platforms for both buy- and sell-side users ("all-to-all" platforms). Defendants killed all three.

99.     TeraExchange, for example, developed an SEF platform designed to facilitate anonymous electronic trading of IRS and other swaps that would be open to buy- and sell-side users alike.  TeraExchange also worked with CME to create a system for central clearing, lending CME credibility to the venture.  But when the Bank Defendants learned that several major buy-side entities intended to participate in the TeraExchange platform, they took action to stop the exchange.

100.    First, Defendants BNPP and Bank of America made clear to buy-side entities affiliated with TeraExchange that participating in the project would have serious consequences because the dealers would respond by inflating fees they charged the buy-side firms for other business, and/or would refuse to deal with them altogether.  The buy-side entities thus withdrew from TeraExchange, delivering a significant blow not only because TeraExchange lost key early-stage participants, but also because of the deterrent message the banks sent to the market as a whole.  The incumbent dealers made clear that buy-side participation in all-to-all swap exchanges would lead to retaliation.

101.    Second, the Bank Defendants collectively boycotted TeraExchange, starving it of liquidity.

102.   These actions had their intended effect.  TeraExchange never got off the ground with an all-to-all swaps exchange, and eventually shifted its focus to bitcoin derivatives.

103.   trueEX, the first swaps exchange approved by the CFTC in the wake of Dodd-Frank, suffered the same fate.  By 2013, trueEx was prepared to bring the competitive benefits of exchange-style anonymous trading and central clearing to buy-side users of IRS.  But when trueEX began touting its plans to include a significant number of buy-side entities on the platform, the Bank Defendants, as with TeraExchange, collectively boycotted trueEx and destroyed its viability.  Today, trueEX is a minor player in the market and does not allow anonymous exchange-style trading for the buy-side.

104.   So, too, with Javelin.  By 2013, Javelin was preparing to launch an all-to-all SEF aimed at attracting buy-side swap volume.  The Bank Defendants accordingly boycotted the platform and pressured buy-side customers into doing the same.  Today, Javelin handles essentially zero trading for IRS.

105.   Defendants were not content, however, to simply exclude new entrants.  They also worked collectively to impose trading rules throughout the marketplace (including for SEF platforms) designed to entrench the status quo.

106.   One example concerns the imposition of so-called Request for Quote ("RFQ") protocols on SEF platforms.  Because Dodd-Frank mandated the development of SEFs for swaps and derivatives, several viable SEFs are indeed operational.  Examples include ICAP (which handles approximately 40.1% of total SEF volume in IRS), Tullett Prebon (approximately 20.9%), Bloomberg (approximately 7.0%), Tradition (approximately 7.5%), BGC (approximately 7.7%), and Tradeweb (approximately 5.3%).[6]

---

[6] Market share data averaged over the period from January 2014 to December 2015.  This data was obtained from FIA, SEF Tracker, *available at* https://fia.org/sef-tracker (last visited Feb. 16,

107.   These and other SEF platforms handle a significant volume of inter-dealer swap transactions, as well as (in certain cases) transactions from the buy-side.

108.   What they do not do, however, is enable all-to-all trading with real-time anonymous execution for buy-side participants.

109.   The reason is because Defendants, working together, have blocked it.  And one of the ways in which they have done so is by coercing the SEF industry into adopting RFQ trading protocols that, in substance, are no different than traditional OTC execution for the buy-side portion of the market.

110.   RFQ means that when a buy-side entity wishes to execute an IRS transaction through an SEF, its order is processed not by real-time exchange-style matching of competitive bids and offers, but rather by the buy-side firm requesting a transaction-specific quote from a dealer.  In this way, the dealers preserve the essential features of the OTC market for buy-side business.  Meanwhile, the dealers are able to trade among themselves on exchange-style SEF platforms with no such competitive restraints.  Because RFQ is effectively OTC by another name, the bifurcated market remains in place.

111.   A related constraint is known as "name give-up," which Defendants have used their collective leverage to impose throughout the SEF industry.

112.   Name give-up is an SEF protocol under which parties to IRS transactions must disclose their identities to counterparties, which allows the dealers to police the parties trading on various SEF platforms (including inter-dealer platforms) to ensure that no buy-side entities are permitted to trade on the more competitive inter-dealer platforms and, instead, are confined to the less competitive RFQ process.

---

2016).

113.    Together, RFQ and name give-up rules have reinforced the bifurcation of the IRS market even in the post-Dodd-Frank era, and Defendants have maintained this division through a series of unlawful collective means, including (i) boycotts and threats of boycotts to ensure that RFQ and name give-up rules remain in place, (ii) collectively directing inter-dealer trade volume to SEFs that imposed RFQ and name give-up restraints on buy-side participants, and (iii) punishing buy-side firms that attempted to trade anonymously on inter-dealer SEFs.

114.    For example, when an SEF platform known as GFI proposed anonymous trading in 2014, GFI received "heated" phone calls from executives at JP Morgan and Credit Suisse, forcing GFI to scrap its plans for anonymous exchange-style trading.[7]  When GFI said "it would allow anonymous trading, several banks threatened to pull their business off the platform, according to people familiar with the matter.  GFI reversed course."[8]  Another market observer concluded that any venue "that goes anonymous is sending a signal that the buyside is becoming part of its platform.  You'll get wider spreads or even dealers withdrawing from that platform."[9]

115.    Other SEFs suffered a similar fate, including TeraExchange, trueEX, and Javelin, all three of which were boycotted (as described in ¶¶ 98-104, *supra*) for proposing platforms with alternative rules and/or anonymous all-to-all execution.[10]

---

[7] *See* Katy Burne, *CFTC to Propose Swaps Anonymity*, Wall St. J. (Feb. 16, 2015), http://www.wsj.com/articles/cftc-to-propose-swaps-anonymity-1424132424.

[8] Charles Levinson, *Startup challenges Dominance of Big Banks in Derivatives Markets*, Reuters (Mar. 10, 2015), http://www.reuters.com/article/markets-derivatives-exchange-insight-gra-idUSL1N0WB2D520150310.

[9] Kim Hunter, *Growing Pains*, Markit (Winter 2014), http://content.markitcdn.com/corporate/Company/Files/MagazineEntireIssue?CMSID=1277525d e02549adbf7b422b9b34f641).

[10] It is not the case that name give-up is justified on the grounds—sometimes advanced by dealers—that it is a necessary tool for assessing the creditworthiness of a counterparty.  Instead, because exchange-style trading (including many SEFs) typically is coupled with central "clearing," counterparty risk is eliminated because the clearinghouse, not the counterparty,

116.    Defendants' clear message to the SEF industry—avoid anonymous all-to-all exchanges or else—was further reinforced by collective efforts to direct inter-dealer business to SEFs that agreed to maintain the bifurcated buy-side versus sell-side market.  For example, Defendants ICAP and Tradeweb—both leading SEFs—agreed to exclude the buy-side from direct participation in platforms used by the dealers, and to maintain RFQ and name give-up protocols for buy-side platforms, in exchange for which the Bank Defendants directed a massive volume of sell-side IRS business to both ICAP and Tradeweb.  These agreements and market restraints were imposed with anticompetitive intent and effects, once again to forestall any type of all-to-all exchange open to the buy-side.

117.    Finally, the Bank Defendants recently have engaged in other direct threats and retaliation to deter buy-side entities from making markets on SEF platforms.  Indeed, in April 2015, CFTC Commissioner Timothy Massad reported that swap exchange platforms were reluctant to offer anonymous trading "because of potential retaliatory action by other market participants."[11]

### DEFENDANTS' INDEPENDENT COMPETITIVE INTEREST

118.    Absent a conspiracy, the individual interests of many different IRS market participants, including Defendants, interdealer brokers, clearinghouses, and SEFs, were to offer an all-to-all trading platform to the buy-side.  But for Defendants' collusive conduct, such a platform would have generated large new revenue streams for the offeror through increased volume and market share.  Absent participation in the conspiracy, Defendants would have thus

---

guarantees each side of the trade.  In today's world of electronic exchange-style execution and central clearing—both of which are employed by all manner of established derivative exchanges (including SEF platforms)—the practice of name give-up serves the purposes of policing Defendants' conspiracy but little else.

[11] Remarks of Chairman Timothy Massad Before the ISDA 30th Annual General Meeting (Apr. 23, 2015), *available at* http://www.cftc.gov/PressRoom/SpeechesTestimony/opamassad-17.

had incentive to increase their own market share of the IRS market with lower prices, by either creating or participating in such an all-to-all exchange based platform.

### ANTICOMPETITIVE EFFECTS

119.     Exchange trading of derivatives typically leads to improved efficiency, transparency, and competitive prices for end-use consumers.

120.     In the market for IRS, by contrast, such benefits are enjoyed by Defendants in their inter-dealer transactions but not by the buy-side.

121.     Because of the conduct alleged in this Complaint, buy-side firms paid supracompetitive prices (*i.e.*, spreads) for an extraordinary volume of IRS transactions during the relevant period.

122.     The Bank Defendants, in turn, reaped supracompetitive profits as a result of their actions.  While concrete profit data is not available for the Bank Defendants' IRS operations, it is likely that Class Members suffered billions of dollars of overcharges.

123.     JP Morgan, for example, stated in 2012 that it typically earned $350 million *per quarter* from its IRS business.[12]

124.     Similarly, Bloomberg reported in 2014 that the risk of the IRS business "stepping into the light" would cost JP Morgan an estimated "$1 billion to $2 billion in revenue a year."[13]

---

[12] *See* Michael J. Moore, *JPMorgan Says Credit, Swaps Among Trading Revenue Leaders,* Bloomberg (Feb. 28, 2012) ("JPMorgan Chase & Co. said interest-rate swaps and credit are among the biggest source of revenue in its trading businesses, as it broke with most U.S. rivals by releasing a breakdown typically kept secret."), http://www.bloomberg.com/news/articles/2012-02-28/jpmorgan-says-credit-swaps-lead-trading-revenue-sources-in-rare-breakdown.

[13] Matthew Leising, *A Safer Way to Trade Interest Rate Swaps*, Bloomberg (Feb. 27, 2014), http://www.bloomberg.com/bw/articles/2014-02-27/interest-rate-swaps-trading-comes-out-of-the-shadows.

125.    As an industry source quoted by Bloomberg explained:  "People's bonuses are tied up in that . . . This has been a very good business for the dealers for a very long time."[14]

## EQUITABLE TOLLING

126.    Plaintiffs incorporate by reference the allegations each preceding and succeeding paragraph of this Complaint as though fully set forth herein.

127.    By its nature, the conspiracy alleged herein was self-concealing because Defendants conspired through secret activities, communications, and conduct to manipulate the IRS market without detection.

128.    The very nature of the IRS industry—an opaque and traditionally OTC marketplace in which the Bank Defendants maintained tight control over all aspects of buy-side business—operated to conceal Defendants' activity vis-à-vis buy-side Class Members.

129.    Defendants also engaged in affirmative acts of concealment, including but not limited to market statements that led Class Members and others to believe that IRS prices were the product of competitive market conditions rather than Defendants' collusive and anticompetitive conduct, as well as non-disclosure and/or intentional cover-up of the conspiratorial activity at issue.

130.    For example, Defendants implemented their conspiracy, in part, through nonpublic meetings of the Tradeweb board of directors.  Defendants also met regularly (and privately) in connection with numerous IRS industry groups, associations, and consortia, which allowed Defendants to coordinate their efforts on a highly confidential basis, in many cases protected by non-disclosure agreements.  Defendants even developed code names for certain of these collective projects and consortia.

---

[14] *Id.*

131.    Defendants likewise met regularly in person and communicated by telephone, email, instant messaging, and Bloomberg messaging in connection with their conspiratorial activity, none of which was accessible to Plaintiffs and the Class.

132.    Defendants also concealed their conspiracy by their practice of retaliating against market participants that threatened to disrupt the status quo.  Had entities involved in IRS sales and trading not faced the demonstrable risk of retaliation by the dominant sell-side dealers, the conspiracy could have been revealed long ago.

133.    Because of these active steps of concealment, including fraudulent concealment, Plaintiffs and the Class did not discover and could not have discovered through reasonable due diligence that they were injured by Defendants' conspiracy during the class period.

134.    Accordingly, Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## CLASS ACTION ALLEGATIONS

135.    Plaintiffs bring this action as a class action under Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and all others similarly situated. The Class is defined as:

> All "buy-side" persons or entities which engaged in IRS transactions directly with Bank Defendants (or their subsidiaries and/or affiliates), between January 1, 2007 and the present.  Excluded from the class are defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, as well as federal government entities (including the Court and any members of the Court's immediate family).

136.    The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class Members is unknown to Plaintiffs at this time, Plaintiffs believe that at least tens of thousands of geographically dispersed Class Members purchased and/or terminated IRS during the relevant period.

137.    Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and the members of the Class sustained damages arising from Defendants' common course of conduct in violation of the antitrust laws as alleged herein.

138.    The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the antitrust laws as alleged herein.

139.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

140.    Plaintiffs and their counsel have sufficient financial resources to adequately and vigorously litigate this class action.  Plaintiffs can and will fairly and adequately represent the interests of the Class and have no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.

141.     Numerous questions of law and fact are common to the Class, including, but not limited to:

a.    Whether Defendants and their co-conspirators engaged in a combination or conspiracy among themselves to allocate the IRS market between themselves, thereby inflating prices associated with the purchase and sale of IRS in the United States, in violation of the Sherman Act;

b.    The identity of the participants in the conspiracy;

c.    The scope and duration of the conspiracy;

d.    The nature and character of the acts performed by Defendants in furtherance of the conspiracy;

e.    Whether Defendants' conduct injured Plaintiffs and Class Members;

  f.  Whether Defendants fraudulently concealed the conspiracy's existence from Plaintiffs and Class Members;

  g.  Whether Defendants' manipulations caused the prices of IRS to be artificially high;

  h.  The appropriate injunctive and equitable relief for the Class; and

  i.  The appropriate measure of damages sustained by Plaintiffs and Class Members.

  142. Common questions of law and fact predominate over any questions affecting only individual Class Members.

  143. A class action is superior to separate, individual litigations for the fair and efficient adjudication of this controversy.  It will enable a large number of similarly situated persons to adjudicate common claims simultaneously and efficiently.  It will eliminate the costly duplication of thousands of repetitive individual litigations and will eliminate the risk of inconsistent or varying adjudications.

  144. Class treatment will allow for the adjudication of  claims by many Class Members that would not otherwise be amenable to efficient or affordable resolution.

  145. The Class is readily ascertainable.  Class Members can be identified in the files of Defendants, the public record, or Class Members' own documents.

  146. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## CLAIM ONE
**(Conspiracy to Restrain Trade in Violation of Section 1 of the Sherman Act)**

147.    Plaintiffs incorporate by reference the allegations in each preceding and succeeding paragraph of this Complaint as though fully set forth herein.

148.    In violation of Section 1 of the Sherman Act, Defendants entered into and engaged in a conspiracy to jointly boycott and otherwise exclude from the marketplace entities that would have introduced competition on bid-ask spreads for buy-side IRS business in the United States, including but not limited to all-to-all exchanges.

149.    Defendants' conspiracy constitutes an unreasonable, *per se* violation of the federal antitrust laws and, moreover, lacked any procompetitive justification.

150.    Defendants' conspiracy occurred within the flow of interstate commerce and substantially affected interstate commerce.

151.    Defendants' conspiracy caused substantial anticompetitive effects and injury to members of the proposed class.

## CLAIM TWO
**(Unjust Enrichment)**

152.    Plaintiffs incorporate each preceding and succeeding paragraph as though fully set forth herein.

153.    Defendants were unjustly enriched at the expense of and to the detriment of Plaintiffs and members of the Class.  Defendants knowingly acted in an unfair, unconscionable, and oppressive manner toward Plaintiffs and Class Members by manipulating the IRS market, in conscious and/or reckless disregard of Plaintiffs' and Class Members' rights.

154.    Defendants were unjustly enriched because they charged Plaintiffs and Class Members more for IRS than they would have otherwise received absent Defendants' collusion.

155.    Class Members have no adequate remedy at law for these unjust and misappropriated gains.  The Court should issue a constructive trust compelling Defendants to disgorge all unlawful or inequitable proceeds, and all monies that Defendants unjustly retained that should have been paid to Plaintiffs and Class Members.  Plaintiffs and Class Members are also entitled to rescission of the transactions or rescissory damages.

156.    The banks worked in concert and conspired to exclude competitors from the IRS market in order to enable the continued charging of supracompetitive economic rates.  Although each Defendant may not have profited off each and every transaction, the conspiracy allowed all Defendants to profit at the expense of Plaintiffs and Class Members.  Accordingly, any Defendant not in privity on a given transaction is included as a co-conspirator.

157.    All Defendants committed numerous overt acts in furtherance of the conspiracy and agreement.  Defendants acted with malice, and intended to injure Plaintiffs and Class Members.

158.    Each Defendant was aware of the conspiracy and acted in furtherance of its objectives.

159.    Plaintiffs and Class Members seek restoration of the monies that Defendants unfairly and improperly took from them.

## PRAYER FOR RELIEF

Plaintiffs demand the following relief:

A.    That the Court certify this lawsuit as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be designated as class representatives, and that Plaintiffs' counsel be appointed as counsel for the Class;

B.      That the unlawful conduct alleged herein be adjudged and decreed to violate

Section 1 of the Sherman Act;

C.      That Defendants be permanently enjoined and restrained from continuing and

maintaining the conspiracy alleged herein;

D.      That the Court award Plaintiffs and the Class treble damages against Defendants

for their violations of federal antitrust laws, plus interest;

E.      That the Court award monetary losses suffered by Plaintiffs and Class Members

that were in contractual or quasi-contractual relationships with a Defendant or an affiliate

thereof;

F.      That the Court award Plaintiffs and the Class their costs of suit, including

reasonable attorneys' fees and expenses, as provided by law; and

G.      That the Court direct such further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury

trial for all issues triable by a jury.



DATED:      Chicago, Illinois
            February 18, 2016

                                            /s/ George A. Zelcs
                                            George A. Zelcs

George A. Zelcs
Randall P. Ewing *(pro hac vice* application
forthcoming)
**KOREIN TILLERY, LLC**
205 Michigan Avenue, Suite 1950
Chicago, IL 60601
Tel.:   (312) 641-9750
gzelcs@koreintillery.com
rewing@koreintillery.com

Michael J. Guzman (*pro hac vice*
application forthcoming)
Derek T. Ho *(pro hac vice* application
forthcoming)
**KELLOGG, HUBER, HANSEN, TODD,
EVANS & FIGEL, P.L.L.C.**
Sumner Square
1615 M Street, NW, Suite 400
Washington, DC 20036
Tel.:  (202) 326-7900
mguzman@khhte.com
dho@khhte.com

Robert E. Litan *(pro hac vice* application
forthcoming)
Steven M. Tillery
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Tel.: (314) 241-4844
stillery@koreintillery.com
rlitan@koreintillery.com

R. Bryant McCulley (*pro hac vice*
application forthcoming)
Stuart H. McCluer (*pro hac vice*
application forthcoming)
**McCULLEY McCLUER PLLC**
1022 Carolina Boulevard, Suite 300
Isle of Palms, SC 29451
Tel:  (662) 550-4511
bmcculley@mcculleymccluer.com
smccluer@mcculleymccluer.com

W. Percy Badham III (*pro hac vice* application forthcoming)
Sam David Knight (*pro hac vice* application forthcoming)
**BADHAM & BUCK LLC**
2001 Park Place, #500
Birmingham, AL 35203
Tel:  (205) 521-0036
pbadham@badhambuck.com
sdknight@badhambuck.com

Michael J. Boni (*pro hac vice* application forthcoming)
Joshua D. Snyder (*pro hac vice* application forthcoming)
**BONI & ZACK LLC**
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Tel:  (610) 822-0200
mboni@ bonizack.com
jsnyder@bonizack.com

Tim C. Holleman (*pro hac vice* application forthcoming)
**BOYCE HOLLEMAN & ASSOCIATES**
1720 23rd Ave./Boyce Holleman Blvd.
Gulfport, MS 39501
Tel: 228-863-3142
tim@boyceholleman.com

Michael W. Fuller (*pro hac vice* application forthcoming)
S. Wayne Fuller (*pro hac vice* application forthcoming)
**FULLER, WILLINGHAM, FULLER & CARTER, LLC**
413 First Avenue SW
Cullman, AL 35055
Tel:  (256) 734-2023
mfuller@fandwlaw.com
sfuller@fandwlaw.com

Jeffrey S. Istvan (*pro hac vice* application forthcoming)
Matthew Duncan (*pro hac vice* application forthcoming)
Adam J. Pessin (*pro hac vice* application forthcoming)
**FINE, KAPLAN AND BLACK, R.P.C.**
1 South Broad St., 23rd Floor
Philadelphia, PA 19107
Tel.:    (215) 567-6565
jistvan@finekaplan.com
mduncan@finekaplan.com
apessin@finekaplan.com

Jonathan Compretta (*pro hac vice* application forthcoming)
**MIKE MOORE LAW FIRM, LLC**
10 Canebrake, Suite 150
Flowood, MS  39232
Tel:  (601) 933-0070
jc@mikemoorelawfirm.com

*Attorneys for Plaintiffs*